Macready and Burke vs. Schenck et al.

No. 10,724.

CHARLES MACREADY AND N. BURKE, EXECUTORS, VS. CHARLES H.
SCHENCK ET AL.

43  479
52  1343

1. Previous phases of this litigation reviewed.
2. The sureties on the bond of the liquidator bound themselves for his honest and
   faithful administration, and for his rendition of "a true, just and perfect ac-
   count of his actions and doings" as such; the object of the bond is to hold the
   obligees harmless from fraud, shortcomings and malpractices on his part.
3. Neither the liquidator nor his sureties can shield themselves from responsi-
   bility for fraudulent waste and conversion of assets because effected by means.
   of sale under a judicial order, during the pendency of an appeal from said order,
   on which it was annulled and set aside, and when it is shown that the order
   was invoked and executed as a means of transferring the effects of the partner-
   ship to the liquidator himself, at a ruinous sacrifice, and with the fraudulent
   purpose to enrich himself enormously at the expense of his co-partner.
4. The law furnishes a remedy against fraud, whatever guise it may assume, and
   even when perpetrated through the machinery of judicial orders and decrees,
   where the court is made its unconscious instrument, it is not beyond remedy
   when exposed.

APPEAL from the Civil District Court for the Parish of Orleans.
Monroe, J.

*Thos. J. Semmes, J. A. Rozier* and *J. C. & S. L. Gilmore* for Plain-
tiffs and Appellees.

*W. S. Benedict* and *George H. Theard* for Defendants and Appellants.

The opinion of the court was delivered by

FENNER, J.   A brief *resumé* of the past phases of this litigation is
as follows:

The late Margaret Haughery and Bernard Klotz were in partner-
ship at the death of the former.

The articles of the partnership agreement provided that in case of
the death of either partner previous to the expiration of the term
agreed on, "the business should be conducted by the survivor for
his or her benefit, and for that of the legal representatives of the
deceased partner, so as to wind up the concern without any detri-
ment thereto, and thereafter the survivor should make and render
a true, just and final account of all things relating to the business,
and a true adjustment and division of the stock and profits thereof."

Under this article, Klotz conducted the business for six months after Margaret's death, but without taking any steps toward "winding up the concern."

He then applied to the court to be appointed liquidator of the partnership, which was opposed by the executors of Margaret; but the court nevertheless granted the order appointing him, on a bond for $40,000, which he furnished, with the present defendants as sureties thereon. He also procured an order for an inventory of the partnership, which was taken under his own supervision, and was homologated on his own petition.

The executors appealed devolutively from the order appointing him liquidator, but notwithstanding said appeal, Klotz proceeded rapidly to force the liquidation, by proceeding, almost immediately after appointment, to procure an order for the sale at public auction of the merchandise and other movable property of the partnership, and, a little later, another order, for the sale of the immovables, fixtures, debts due the firm, etc. From these orders the executors also appealed. Our decision on these orders will be found in 35th An., p. 596, by which, for the reasons stated, all these orders were annulled, avoided and reversed.

In the meantime, however, the sales had been effected, resulting in a ruinous sacrifice, and bringing but a trifle in comparison with the value placed on the effects very shortly before in the inventory taken and homologated at the instance of Klotz himself, and also with the sum which he had himself offered to pay for them before his appointment.

Next followed proceedings for an account between Klotz and the executors.

Klotz claimed the right to account on the basis of value as settled by the prices received at the auction sales. This was opposed by the executors. A vast amount of evidence was taken. On the appeal taken to this court our decision appears in 39 An. 638.

We found, in substance, that the sale was a fraudulent device of Klotz to pass the property into his new firm, which he had formed to succeed the old, at insignificant prices; that, though apparently adjudicated to third persons, the property, or most of it, never left his possession, but was immediately transferred to him at the same prices, conformably to a previous understanding, and that bidders were deterred at the sale, in some cases, on the representation ex-

Macready and Burke vs. Schenck et al.

pressly or impliedly made that the surviving partner was buying or intending to buy. We said: "Leaving out of view the question whether the order of sale was or not suspended by the appeal, it is manifest that from the incipiency throughout, Klotz was impelled by selfish considerations, the object of which was to enrich himself *per fas aut nefas* at the expense of his deceased partner." We therefore entirely disregarded the prices bid at the sale; and held Klotz to account according to the values as fixed on his own inventory, on the theory that his proceedings amounted to an illegal waste and conversion of the partnership effects.

Instead, therefore, of the $3360, reported by him in his account, we gave judgment against Klotz for $31,341.65.

Klotz having failed to pay, the executors next instituted the instant proceeding against the sureties on his bond. They were met by legal exceptions which were sustained in the lower court, but on appeal this court overruled the exceptions and remanded the case to be tried on the merits. Executors vs. Schenck et al., 41 An. 456.

It now returns to us on appeal from a judgment of the District Court, condemning the sureties in the sum of $16,134.34, with interest.

The judge *a quo* rendered an able opinion from which we quote:

"Under the decision of the Supreme Court (41 An. 456), the defendants, as sureties, are liable for the value of the assets of which their principal acquired possession under his appointment as liquidator, September 12, 1882, and which he subsequently caused to be sold at auction. Defendant's counsel, if I understand them, assume that the values in question are fixed by the sales of the property, at the prices realized. But there are two reasons urged by plaintiff's counsel why this can not be the case, viz: (1) It has been held that the sales in question were made without legal authority, and afford no protection to the liquidator or his sureties. (2) It is charged, and *quoad* the liquidator, it has been decided, that the prices realized at those sales were influenced in the interest of the liquidator by him and his friends. Both of these propositions are, in my judgment, well taken.

As to the first, there can be no dispute. As to the second, dispute avails nothing for the fact exists. That those who bid in the property sold in the interest of the liquidator, and left it in his possession at the price at which it was adjudicated to them, may not

31*

have reflected at the moment that they were thereby aiding in depriving the succession of the liquidator's deceased partner of that which belonged to it, in order that the liquidator might be enriched, is possible; but the fact remains that the property which the liquidator was engaged in selling, and for which it was his duty as the representative of the partnership to obtain the highest possible price, was purchased by or for him through third persons, so that his personal interest was that it should be sold at the lowest possible price, thereby bringing his interest in conflict with his duty.

The judge, therefore, followed the course of this court in the 39 An. case, and entirely disregarded the auction sales as in any manner determining the value of the property.

Defendants very vigorously contend that the orders of sale, though appealed from, were effective until reversed, and authorized the sale made thereunder; that, if said sales had been fairly conducted the values realized thereat would have been conclusive; and that, even setting aside the actual sales on account of the illegal conduct of the liquidator, still the test of the real value for which they are liable must be the value which the property would have realized at said sales, had they been fairly conducted.

They then claim, and attempt to maintain by evidence, that, from its nature and situation, the property derived almost its sole value from its employment in the particular businesss in which it was engaged, and that it had little or no value for other persons, and therefore could have brought but insignificant prices at the auction sales however fairly conducted.

These arguments, though plausible, prove too much. They unmask and expose, in absolute nudity, the schemes of fraud involved in this liquidation as we said in 39 An. " from its incipiency throughout."

Here was property engaged in an established and profitable business, to which it was necessary, and for the purpose of which it had large value, admitted by Klotz himself prior to and at the very time when he inaugurated the litigation. But if he could only have it put up for sale at public auction, disconnected from the business, it would necessarily bring next to nothing.

To procure such a sale made it plain sailing for his interests. He would form a new firm to continue the business; he would take in the property at the sacrifices which the sale would involve; to

him, in the new business, it would have the same value which, by his own confession, it had in the old, and yet would have cost him but a song, thus enabling him to enrich himself enormously at the expense of the succession of his deceased partner.

This explains why he rushed through the liquidation and forced the sales, notwithstanding the appeals taken by the executors; and now, after this court has annulled all the proceedings, he and his sureties snap their fingers in the face of justice and say, "the fraud is accomplished and can not be undone."

We have already answered this contention when urged by Klotz, and we must make a like answer to his sureties. They have bound themselves for his honest and faithful administration as liquidator, and that he shall "render a true and perfect account of his actions and doings" as such.

The object of the bond is to save the obligees harmless from the effect of frauds, shortcomings and malpractices on the part of the liquidator.

We are satisfied that he has designedly wrecked the trust committed to him, for his own interest and advantage. Neither he nor his sureties can protect themselves behind judicial orders provoked *ex parte* and subsequently annulled by this court.

The law is not powerless to remedy such a wrong. In the language of Mr. Burge: "*Crescit in orbe dolus;* cases can not always be found to serve as direct authority for subsequent cases, but if a case arise of fraud, or presumption of fraud, to which even no principle already established can be applied, a new principle must be established to meet the fraud, just as the principles on which former cases have been decided have been from time to time established, as fraud contrived new devices; for the possibility will always exist that human ingenuity, in contriving fraud, will go beyond any cases which have before occurred." Burge on Suretyship, p. 220.

Fraud perpetrated through the machinery of judicial orders and decrees, where the court is made the unconscious instrument, is not beyond remedy when exposed. Prats vs. Creditors, 5 Rob. 288; Blodget vs. Hogan, 10 An. 18.

We, therefore, agree with the judge *a quo* that the auction sales are to be entirely disregarded as affording any criterion of value.

His opinion proceeds as follows:

"The question now is, what was the real value of the property

thus disposed of.   After considering the various sources of information on the subject, I am satisfied that the ends of justice will be best subserved by accepting in most instances the values as stated in the account of the liquidator (Transcript, 9607, p. 517), and holding the defendants for the difference between these values and the prices at which the property was sold.

"An exception lies, however, in the case of the *machinery*, which figures on said account at a valuation of $12,312.99, which sum, as taken from the books of Margaret Haughery & Co., includes a good deal which is not to be taken into occount for the present purposes. Nor am I satisfied with the method suggested by plaintiff's counsel for arriving at a valuation of the machinery.   My conclusion, from all the evidence, is, that $7500 would fairly represent that value, including the new boilers sold to Schwartz, and that the difference between that sum and the amounts paid by Camors and Schwartz is the sum for which the defendants are liable.

" The La Joya stock is another exception. · I am satisfied from the affirmative evidence in the record that it is not worth the amount at which it was sold, and I don't think the plaintiff can expect the court, conscientiously, to put them in a better position than if there had been no sale.

" The *bad debts*, also, have been shown affirmatively to be bad still.   Upon the other hand, in the account of the liquidator, he credits himself with ' Expense' to the amount of $2001.04, none of which, as far as I can judge, save the item of $500 to Flower and $435.56 interest, are chargeable against Margaret's succession, so that the liquidator's account should be credited by ' Expenses' in the sum of $935.56, instead of $2001.04; and the balance, as shown by that account, should be $4426.34, instead of $3360.86.   Starting, then with this balance, and adding thereto the difference between the real value of the property sold and the prices at which the liquidator propose to account for it, we have :

BALANCE OF CASH AFTER CORRECTING :

" By expenses, $4426.34.

" Difference between value of the following personal property, and figure at which the same was sold by the liquidator, to-wit: Machinery, including boilers sold to Schwartz:

Plaintiffs claim an amendment increasing this judgment, while defendants contend that, even under the principles adopted by the court, it should be reduced.

We have carefully considered the particular contentions on either side, and are satisfied that the judgment as it stands does substantial justice.

We will only mention two points made by defendants, viz:

1. They claim that the value of the oven and chimney should be deducted from the machinery allowance. Obviously it has been deducted in the reduction made by the judge in that item.

2. They suggest that the interest of Klotz as half-owner of the property has been ignored. In as much as under the settlement made by this court Klotz stands condemned to pay to plaintiffs more than $31,000; his interest in these particular assets cuts no figure.

The other objections admits of equally conclusive answers; but it is useless to prolong an opinion already too much extended.

Judgment affirmed.